COURT OF APPEALS OF VIRGINIA

Present:  Judges Chafin, O'Brien and Russell
Argued at Salem, Virginia

CHRISTIAN JOHN PREKKER

v.        Record No. 2175-14-3

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE WESLEY G. RUSSELL, JR.
MARCH 8, 2016

FROM THE CIRCUIT COURT OF PITTSYLVANIA COUNTY
Stacey W. Moreau, Judge

James C. Martin (Martin & Martin Law Firm, on brief), for
appellant.

Eugene Murphy, Senior Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.

Appellant entered a conditional guilty plea to the charge that he illegally possessed a firearm in violation of Code § 18.2-308.2 after having been previously adjudicated delinquent for an offense that would have been a felony if he had been an adult.  Pursuant to the terms of the conditional guilty plea, appellant preserved for appellate review his arguments that the trial court erred in applying Code § 18.2-308.2's mandatory minimum sentence provisions to him, that Code § 18.2-308.2 is unconstitutional as applied to him, and that this Court's prior interpretation of Code § 18.2-308.2's mandatory minimum sentence provisions renders the statute vague to the point that a citizen is not on notice as to what the law actually is.  For the reasons that follow, we disagree with appellant and affirm his conviction for violating Code § 18.2-308.2.

BACKGROUND

In 2012, while seventeen years old, appellant was adjudicated delinquent for two instances of violating Code § 18.2-248(G), possession with intent to distribute imitation cocaine.  The

violations of Code § 18.2-248(G) would have been non-violent felonies if appellant had been an adult when he committed the offenses. Appellant does not dispute that he was over the age of fifteen at the time of the conduct underlying the delinquency adjudications.[1]

On December 31, 2013, when investigating another matter at appellant's residence, police officers discovered two firearms, specifically two operable long guns. At the time of the discovery, appellant acknowledged his possession of them, stating that he was keeping them for someone else who was going to use them to go hunting. Appellant was charged with violation of Code § 18.2-308.2 and with grand larceny unrelated to the firearms.[2]

In the trial court, the parties agreed that appellant had been previously adjudicated delinquent of offenses that would have been non-violent felonies if he had been an adult, that he was over the age of fourteen when he committed the offenses, and that, on December 31, 2013, he was under the age of twenty-nine when he was found to possess the firearms. Recognizing that these facts provided a sufficient evidentiary basis for convicting him of the violation of Code § 18.2-308.2, appellant entered a conditional guilty plea.[3] The trial court accepted the conditional guilty plea and, citing our decision in Carter v. Commonwealth, 38 Va. App. 116, 562 S.E.2d 331

---

[1] At trial, appellant stipulated that he was over fourteen, the age specified in Code § 18.2-308.2(A)(iii), at the time of the underlying offenses. At argument, he did not dispute that he was at least fifteen at the time of the offenses, which is significant for the reasons detailed in Section II (D), infra.

[2] Appellant was convicted of grand larceny and sentenced to three years, all suspended, for that crime. The grand larceny charge is not a subject of this appeal.

[3] Appellant initially pled not guilty and raised constitutional challenges to Code § 18.2-308.2 by way of pretrial motion. Only after the trial court rejected his constitutional challenges did he seek to change his plea. With the consent of the trial court and the Commonwealth, he entered a conditional guilty plea. See Code § 19.2-254 ("With the approval of the court and the consent of the Commonwealth, a defendant may enter a conditional plea of guilty in a misdemeanor or felony case in circuit court, reserving the right, on appeal from the judgment, to a review of the adverse determination of any specified pretrial motion. If the defendant prevails on appeal, he shall be allowed to withdraw his plea.").

(2002), applied the statute's mandatory minimum sentencing provisions to appellant. As a result, the trial court sentenced appellant to two years of incarceration.

Appellant's conditional guilty plea preserved his ability to challenge on appeal aspects of both his sentence and his conviction. Specifically, appellant retained the ability to argue that the trial court erred in applying Code § 18.2-308.2's mandatory minimum sentence provisions to him, that Code § 18.2-308.2 is unconstitutional as applied to him, and that this Court's prior interpretation of Code § 18.2-308.2's mandatory minimum sentence provisions renders the statute unconstitutionally vague.

Appellant noted and perfected his appeal, asserting the following assignments of error:

> 1.	The trial court erred in ruling that in prosecutions for the violation of Va. Code § 18.2-308.2 where the predicate offense is a delinquent act, the mandatory minimum sentence provisions are nonetheless applicable.
>
> 2.	The trial court erred in failing to rule that Va. Code § 18.2-308.2 is unconstitutional as applied to cases involving predicate delinquent acts in that it unreasonably infringes upon the Right of the People to Keep and Bear Arms pursuant to the Second Amendment to the Constitution of the United States (as applied to the states through the Fourteenth Amendment) and Article I, § 13 of the Constitution of Virginia.[4]
>
> 3.	Va. Code § 18.2-308.2 is unconstitutional to the extent that it purports to apply mandatory minimum sentences to cases involving predicate delinquent acts as it fails to give reasonable notice as to the applicability of any such mandatory minimum provisions to delinquent act cases and is thus at best void for vagueness.

---

[4] The Virginia Supreme Court has held that, in general, "the protection of the right to bear arms expressed in Article I, § 13 of the Constitution of Virginia is co-extensive with the rights provided by the Second Amendment of the United States Constitution . . . ." DiGiacinto v. Rector & Visitors of George Mason Univ., 281 Va. 127, 134, 704 S.E.2d 365, 369 (2011). Accordingly, our analysis of appellant's Second Amendment claim applies with equal force to his Article I, § 13 claim.

ANALYSIS

I.  Application of Code § 18.2-308.2's Mandatory Minimum Sentence Provisions to Appellant

Appellant's first assignment of error presents a question of statutory interpretation.  "[A]n issue of statutory interpretation is a pure question of law which [an appellate court] review[s] *de novo*."  Conyers v. Martial Arts World of Richmond, Inc., 273 Va. 96, 104, 639 S.E.2d 174, 178 (2007) (citations omitted).

Code § 18.2-308.2(A) provides as follows:

> It shall be unlawful for (i) *any person who has been convicted of a felony*; (ii) any person adjudicated delinquent as a juvenile 14 years of age or older at the time of the offense of murder in violation of § 18.2-31 or 18.2-32, kidnapping in violation of § 18.2-47, robbery by the threat or presentation of firearms in violation of § 18.2-58, or rape in violation of § 18.2-61; or (iii) *any person under the age of 29 who was adjudicated delinquent as a juvenile 14 years of age or older at the time of the offense of a delinquent act which would be a felony if committed by an adult,* other than those felonies set forth in clause (ii), whether such conviction or adjudication occurred under the laws of the Commonwealth, or any other state, the District of Columbia, the United States or any territory thereof, to knowingly and intentionally possess or transport any firearm or ammunition for a firearm, any stun weapon as defined by § 18.2-308.1, or any explosive material, or to knowingly and intentionally carry about his person, hidden from common observation, any weapon described in subsection A of § 18.2-308. However, such person may possess in his residence or the curtilage thereof a stun weapon as defined by § 18.2-308.1.  *Any person who violates this section shall be guilty of a Class 6 felony.  However, any person who violates this section by knowingly and intentionally possessing or transporting any firearm and who was previously convicted of a violent felony as defined in § 17.1-805 shall be sentenced to a mandatory minimum term of imprisonment of five years.  Any person who violates this section by knowingly and intentionally possessing or transporting any firearm and who was previously convicted of any other felony within the prior 10 years shall be sentenced to a mandatory minimum term of imprisonment of two years*.  The mandatory minimum terms of imprisonment prescribed for violations of this section shall be served consecutively with any other sentence.

(Emphasis added).

Pursuant to the statutory language, adults who are convicted of felonies *and* juveniles adjudicated delinquent for offenses within certain parameters fall within the statute's prohibition, and therefore, possession of a firearm by such a person is a Class 6 felony. Recognizing that "convicted of a felony" and "adjudicated delinquent" are not synonymous, the General Assembly identified them separately in subparts (i), (ii), and (iii).

In addition to establishing the prohibition, the statute provides for mandatory minimum sentences in two instances: (1) offenders "previously convicted of a violent felony as defined in § 17.1-805 shall be sentenced to a mandatory minimum term of imprisonment of five years . . . ;" and (2) offenders "previously convicted of any other felony within the prior 10 years shall be sentenced to a mandatory minimum term of imprisonment of two years." Unlike the prohibition portion of the statute, the mandatory minimum provisions of the statute make no express mention of delinquency adjudications.

Appellant argues that, because his predicate offenses were delinquency adjudications and the mandatory minimum provisions do not mention delinquency adjudications, he should not have received a mandatory minimum sentence. Rather, the trial court should have had all of the "normal" sentencing options it would have had for a Class 6 felony that was not subject to a mandatory minimum.

Appellant acknowledges that this Court has rejected this argument in a published opinion, Carter v. Commonwealth, 38 Va. App. 116, 562 S.E.2d 331 (2002).[5] In Carter, we held that

> in fashioning a statute to protect the public from the threat of
> dangerously armed felons, the legislature expressly included within
> the statutory proscription all persons previously "found guilty,"
> while juveniles, of a "delinquent act," deemed felonious.

---

[5] Appellant notes that the underlying adjudications in Carter were for violent offenses and his underlying adjudications were for non-violent offenses. Because the mandatory minimum provisions apply to both violent and non-violent felonies, this distinction is immaterial to the question before us.

Subsequent reference in Code § 18.2-308.2(A) to "conviction or adjudication" simply recognizes terms that sometimes differentiate determinations of guilt in juvenile and adult prosecutions. Thus, the inclusive language, "*any person*," which appears in the punishment provisions of the statute, clearly embraces anyone found in violation of the prohibition. Contrary to defendant's argument, the statutory language promotes inclusion, not exclusion. A different interpretation would exempt dangerous felons, with demonstrated violent propensities, from a mandated punishment intended to enhance public protection, a narrow and illogical construction at odds with legislative intent.

Id. at 125, 562 S.E.2d at 335.

Carter's holding dictates that we reject appellant's argument. Recognizing this, appellant asks that we overrule Carter. This we cannot do. Butler v. Commonwealth, 64 Va. App. 7, 12, 763 S.E.2d 829, 832 (2014) ("Under the interpanel accord doctrine, [a subsequent panel] lack[s] the authority to revisit" prior published opinions of the Court of Appeals.); Startin v. Commonwealth, 56 Va. App. 26, 39 n.3, 690 S.E.2d 310, 316 n.3 (2010) (*en banc*) (noting that published panel opinions of the Court of Appeals "bind all other three-judge panels under the interpanel accord doctrine . . . ; [however,] they do not bind the Court sitting *en banc*"). Accordingly, consistent with Carter, we find that the trial court did not err in sentencing appellant pursuant to Code § 18.2-308.2's mandatory minimum sentence provisions.

II. "As Applied" Challenge Under the Second Amendment

Appellant argues that, as applied to him, Code § 18.2-308.2's prohibition on possessing firearms violates the Second Amendment. Specifically, he contends that, although the statute's ban on convicted felons possessing firearms is presumptively valid, see District of Columbia v. Heller, 554 U.S. 570, 626-27 (2008); DiGiacinto v. Rector & Visitors of George Mason Univ., 281 Va. 127, 134, 704 S.E.2d 365, 369 (2011), its temporary ban on his possessing a firearm until he reaches the age of twenty-nine as a result of his adjudications of delinquency violates his Second Amendment right "to keep and bear arms." Appellant's constitutional challenge to a Virginia

- 6 -

statute presents a question of law that we review *de novo*.  Toghill v. Commonwealth, 289 Va. 220, 227, 768 S.E.2d 674, 678 (2015).

## A.  The Second Amendment

The Second Amendment to the United States Constitution provides that "[a] well regulated militia, being necessary to the security of a free State, the right of the people to keep and bear arms, shall not be infringed."  In Heller, the United States Supreme Court conducted a lengthy historical analysis of its meaning and recognized that the Second Amendment right was an individual as opposed to collective right.  Heller, 554 U.S. at 592.  Although it did not limit the right to only scenarios involving the defense of the home, the Court recognized that the core of the right was "*the right of law-abiding, responsible citizens* to use arms in defense of hearth and home."  Id. at 635 (emphasis added); see also Kolbe v. Hogan, ___ F.3d. ___, ___, 2016 U.S. App. LEXIS 1883, at *18 (4th Cir. Feb. 4, 2016) (stating that, under Heller, "the right of law-abiding, responsible citizens to use arms in defense of hearth and home lies at the core of the Second Amendment" right (internal citation and quotation marks omitted)).

Six years later, in McDonald v. City of Chicago, 561 U.S. 742 (2010), the Court found that the Second Amendment right was incorporated against the states.[6]  Thus, state statutes that arguably infringe upon the right are subject to constitutional challenge.

---

[6] A four-justice plurality found that the right was incorporated against the states pursuant to the Due Process Clause of the Fourteenth Amendment, McDonald v. City of Chicago, 561 U.S. 742, 767 (2010) (plurality opinion), while Justice Thomas found that it was incorporated against the states by the Fourteenth Amendment's Privileges and Immunities Clause, id. at 806 (Thomas, J., concurring).  Accordingly, although a majority of justices did not agree on a rationale, a majority did agree that "the Second Amendment right is fully applicable to the States."  Id. at 750.

## B. *Heller* and Levels of Scrutiny

Having recognized that the Second Amendment protects an individual right, the Supreme Court also recognized that the right was subject to limitations, holding that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." Heller, 554 U.S. at 626. The Court noted that, since the founding era, the right had been subject to various restrictions that were not believed to suffer any constitutional infirmity. The Court made clear that its holding did not call into question the legitimacy of these restrictions, noting that

> [a]lthough we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

Id. at 626-27. The Court emphasized that these categories were "presumptively lawful regulatory measures [but, were cited] only as examples; [the] list does not purport to be exhaustive." Id. at 627 n.26.

Having found both that the right was subject to restriction and that such restrictions were subject to constitutional challenge, the Court declined to set forth the appropriate level of scrutiny for courts to apply when addressing such challenges. Because of the breadth of the District of Columbia's gun ban, the Court simply noted that the challenged restrictions failed constitutional muster "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights . . . ." Id. at 628.

Although it declined to set forth what the appropriate level of scrutiny is, the Court expressly rejected two potential standards. First, the Court rejected that restrictions on the Second Amendment right were subject to rational basis review, noting that "[i]f all that was required to overcome the right to keep and bear arms was a rational basis, the Second

- 8 -

Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and *would have no effect*." Id. at 628 n.27 (emphasis added). The Court also rejected the "interest-balancing inquiry" proposed in Justice Breyer's dissent, commenting that

> [w]e know of no other enumerated constitutional right whose core protection has been subjected to a freestanding "interest-balancing" approach. The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad. We would not apply an "interest-balancing" approach to the prohibition of a peaceful neo-Nazi march through Skokie. See National Socialist Party of America v. Skokie, 432 U.S. 43, 97 S. Ct. 2205, 53 L. Ed. 2d 96 (1977) (*per curiam*). The First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions for obscenity, libel, and disclosure of state secrets, but not for the expression of extremely unpopular and wrong headed views. The Second Amendment is no different. Like the First, it is the very *product* of an interest balancing by the people—which Justice Breyer would now conduct for them anew. And whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.

Id. at 634-35. Having made clear that neither rational basis review nor an interest balancing approach was appropriate, the Court reserved further explication on the appropriate standard of review to future cases. Id. at 635.

### C. Determining Appropriate Level of Scrutiny after *Heller*

The Heller Court's decision to not specify a level of scrutiny has led to much debate in the academic literature as to what level of scrutiny is appropriate when considering a Second Amendment challenge to a statute. See, e.g., Stacey L. Sobel, The Tsunami of Legal Uncertainty: What's a Court to do Post-*McDonald*?, 21 Cornell J.L. & Pub. Pol'y 489, 490

- 9 -

(2012) (noting that the <u>Heller</u> and <u>McDonald</u> decisions "left a number of critical issues unresolved, such as which standard of review to apply to Second Amendment legal challenges under the Fifth and Fourteenth Amendments" (footnotes omitted)); Robert A. Levy, <u>Second Amendment Redux:  Scrutiny, Incorporation and the <i>Heller</i> Paradox</u>, 33 Harv. J.L. & Pub. Pol'y 203, 206 (2010) (recognizing that, having concluded that the District of Columbia's gun ban failed under any appropriate level of scrutiny, the <u>Heller</u> Court "did not choose a specific standard" for future challenges); Mark Tushnet, <u>Permissible Gun Regulations After <i>Heller</i>: Speculations About Method and Outcomes</u>, 56 UCLA L. Rev. 1425, 1426 (2009) (noting that, after <u>Heller</u>, we know that "[a] complete ban on the possession of handguns for purposes of self-defense in the home is unconstitutional, and many longstanding forms of regulation—bans on possession by felons and prohibitions on carrying firearms in 'sensitive places'—are constitutional.  What we do not know is why." (footnotes omitted)); and Andrew R. Gould, <u>The Hidden Second Amendment Framework within <i>District of Columbia v. Heller</i></u>, 62 Vand. L. Rev. 1535, 1537 (2009) ("Thus, in resolving the question of whether the Second Amendment protects an individual right, the Court created a new mystery: How should courts review claims under the Second Amendment?").

The debate, however, is more than academic.  Faced with Second Amendment challenges to gun statutes and regulations, different courts have applied different levels of scrutiny to the challenged restrictions.  Some courts have applied strict scrutiny.  <u>See, e.g.</u>, <u>Kolbe</u>, ___ F.3d at ___, 2016 U.S. App. LEXIS 1883, at *35; <u>Tyler v. Hillsdale County Sheriff's Dep't.</u>, 775 F.3d 308, 328-29 (6th Cir. 2014), <u>r'hrg en banc granted, opinion vacated</u>, 2015 U.S. App. LEXIS 6638 (Apr. 21, 2015) (recognizing that strict scrutiny is traditionally "appropriate for assessing a challenge to an enumerated constitutional right" (citations omitted)).  Others have applied intermediate scrutiny.  <u>See, e.g.</u>, <u>United States v. Chester</u>, 628 F.3d 673, 683 (4th Cir. 2010);

United States v. Marzzarella, 614 F.3d 85, 97 (3d Cir. 2010); United States v. Skoien, 614 F.3d

638, 641-42 (7th Cir. 2010) (*en banc*).  In determining the appropriate level of scrutiny to apply,

many courts have concluded that certain restrictions should receive strict scrutiny, while other

restrictions need only be subject to intermediate scrutiny:

> the appropriate level of scrutiny depends on the nature of the
> conduct being regulated and the degree to which the challenged
> law burdens the right.  A regulation that threatens a right at the
> core of the Second Amendment—for example, the right of a
> law-abiding, responsible adult to possess and use a handgun to
> defend his or her home and family—triggers strict scrutiny.  A less
> severe regulation—a regulation that does not encroach on the core
> of the Second Amendment—requires a less demanding
> means-ends showing.  This more lenient level of scrutiny could be
> called "intermediate" scrutiny, but regardless of the label, this level
> requires the government to demonstrate a "reasonable fit" between
> the challenged regulation and an important government objective.

NRA, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives, ___ F.3d ___, ___, 2012

U.S. App. LEXIS 26949, at *21-24 (5th Cir. 2012) (internal citations and quotation marks

omitted). See also Chester, 628 F.3d at 682.

In addition to attempting to determine the appropriate level of scrutiny to apply, many

courts have adopted a two-part framework to analyze Second Amendment challenges.  As

recently described by the Unites States Court of Appeals for the Fourth Circuit, a reviewing court

first should

> ask whether the challenged law imposes a burden on conduct
> falling within the scope of the Second Amendment's guarantee.
> The answer to this question requires an historical inquiry into
> whether the conduct at issue was understood to be within the scope
> of the right at the time of ratification.  If the answer to this initial
> inquiry is no, the challenged law is valid.  However, [i]f the
> challenged regulation burdens conduct that was within the scope of
> the Second Amendment as historically understood, then we move
> to the second step of applying an appropriate form of means-end
> scrutiny.

- 11 -

Kolbe, ___ F.3d at ___, 2016 U.S. App. LEXIS 1883, at *17 (internal citations and quotation marks omitted) (alteration in original). Multiple federal circuit courts of appeal have adopted a similar two-part test. See, e.g., Fyock v. Sunnyvale, 779 F.3d 991, 996 (9th Cir. 2015); Ezell v. City of Chicago, 651 F.3d 684, 701-03 (7th Cir. 2011); Heller v. District of Columbia, 670 F.3d 1244, 1252 (D.C. Cir. 2011)[7]; United States v. Reese, 627 F.3d 792, 800-01 (10th Cir. 2010); and Marzzarella, 614 F.3d at 89.

Both in crafting the two-part test and in deliberating over the appropriate level of scrutiny, courts are attempting to resolve tension created by Heller. On the one hand, Heller makes clear that the Second Amendment right provides an individual with protection from government interference in the same manner that the First Amendment protects an individual's First Amendment rights. Heller, 554 U.S. at 635. See also McDonald, 561 U.S. at 778 (concluding that "the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty"). Yet, despite this recognition, the Court gave approval to blanket restrictions of the right when it delineated its categories of "presumptively lawful regulatory measures," Heller, 554 U.S. at 627 n.26, some of which, if subjected to the case-by-case, means-ends analysis that characterizes strict or even intermediate scrutiny, likely would fail to pass constitutional muster.

Although our review of appellant's constitutional challenge is colored by this tension, we need not resolve it in this case. For the reasons that follow, appellant's challenge to the temporary ban on his possession of firearms due to his felonious conduct fails because the restriction is so closely analogous to the presumptively valid ban on possession of firearms by

---

[7] This opinion, often referred to as Heller II, stems from the United States Supreme Court's remand of Heller for further proceedings consistent with the Court's opinion.

felons as to merit no different result.[8]  Accordingly, we need not determine whether bans on

possession of firearms by felons are permissible because such a restriction falls outside the scope

of the Second Amendment right or may be sustained under the appropriate level of scrutiny,

whatever that may be.

---

[8] The Heller Court's listing of presumptively lawful restrictions, including a ban on the possession of firearms by felons, and that listing's restatement and adoption in McDonald has been criticized by Second Amendment scholars.  Regarding the presumptively lawful restrictions and their restatement in McDonald, one Second Amendment scholar has written that the listing was

> unnecessary and irresponsible. . . .  They had no basis in prior Supreme Court case law and they were not supported by evidence of the original meaning of the Second Amendment. . . .
>
> Consider . . . "[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill . . . ."  This sounds intuitively obvious, at least at first.  But how "longstanding" are these prohibitions?  [The majority] either did not know, or decided not to tell us in Heller.  Apparently, however, the first general ban on the possession of firearms by felons was enacted in 1968.  This was 177 years after the adoption of the Second Amendment and less than a decade before the District of Columbia handgun ban was enacted.

Nelson Lund, Two Faces of Judicial Restraint (Or Are There More?) in *McDonald v. City of Chicago*, 63 U. Fla. L. Rev. 487, 502-03 (2011).  See also Glenn Harlan Reynolds, Second Amendment Limitations, Georgetown J. L. & Pub. Pol'y at *7 (forthcoming), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2727790 ("But the Heller "safe harbor" appears to be showing signs of leakage.  Or, at least, it is not transforming–as it might have–into a free pass for extensive limitations on firearms ownership.  Though I doubt that the felons . . . limitation on Second Amendment rights is in any danger of abandonment, it is coming in for more judicial scrutiny.").
     Given the United States Supreme Court's clear statements in both Heller and McDonald that felon-in-possession bans are presumptively valid and the Virginia Supreme Court's adoption of that language in DiGiacinto, we must assume that such a restriction is valid.  It is up to those courts, whose decisions are binding upon us, to revisit the specific language and its effects if they see fit.

D.  Appellant's Challenge to Code § 18.2-308.2(A)(iii)

As with any constitutional challenge to a Virginia statute, we begin with the proposition that the acts of the General Assembly are presumed to be constitutional, and we "will not invalidate a statute unless that statute clearly violates a provision of the United States or Virginia Constitutions." Marshall v. N. Va. Transp. Auth., 275 Va. 419, 427, 657 S.E.2d 71, 75 (2008) (citations omitted).  "[E]very reasonable doubt regarding the constitutionality of a legislative enactment must be resolved in favor of its validity." Id. at 428, 657 S.E.2d at 75 (citations omitted).

Appellant does not dispute that Code § 18.2-308.2(A)(i)'s permanent ban on felons possessing firearms is valid, recognizing that it expressly falls within the scope of presumptively valid regulations recognized by both the United States Supreme Court and the Virginia Supreme Court.  Heller, 554 U.S. at 626-27; DiGiacinto, 281 Va. at 134, 704 S.E.2d at 369.  Rather, he attacks the statute's temporary ban on firearm possession by non-violent juveniles who have been adjudicated delinquent for acts that were felonies if committed by adults, arguing that

> although it is certainly reasonable for a felon to lose his gun rights, the loss of such rights, even if only to age 29, by a citizen who merely has a history as a non-violent juvenile delinquent is irrational, endangers the public (more than it helps them) by unreasonably reducing the number of citizens available for the common defense, and is thus unconstitutional . . . .

Appellant stipulated that, as a juvenile, he violated Code § 18.2-248(G), possession with intent to distribute imitation cocaine, and that such violations would have constituted Class 6 felonies if appellant had been charged as an adult.  The elements of the offense and the conduct necessary to violate Code § 18.2-248(G) are the same whether the offender is tried as a juvenile or as an adult.  Cf. Chardin v. Police Comm'r of Boston, 989 N.E.2d 392, 401 (Mass. 2013) (The fact that a juvenile offender cannot "be sentenced to the State prison does not change the nature

of his offense, even though an 'adjudication' of delinquency generally is not a 'conviction' of a crime. In other words, although the juvenile justice system did not treat [the juvenile offender] as a 'criminal' for his possession of a firearm without a license . . . he nonetheless committed an unlawful act that was a felony." (citations omitted)), <u>cert. denied</u>, ___ U.S. ___, 134 S. Ct. 525 (2013). Thus, given his concession regarding the constitutionality of the ban on felons possessing firearms, appellant necessarily has conceded that he engaged in *conduct* that appropriately could be punished by a lifetime ban on his possession of firearms.

Appellant offers no distinguishing feature of his juvenile adjudications that justifies finding that the presumptively valid ban on possession of firearms by felons does not apply with equal force to juveniles who committed identical felonies.[9] His only proffered justification, that the temporary ban imposed by Code § 18.2-308.2(A)(iii) removes him from the pool of citizens who can provide for "the common defense," also would apply to felony convictions, whether the underlying offense was committed by an adult or a juvenile who was tried as an adult, because those convicted would similarly be removed from the pool.

Furthermore, it is worth noting that juvenile adjudications were unknown at common law, unknown at the time of the ratification of the Second Amendment in 1791, and were still unknown

---

[9] We recognize that juvenile adjudications differ from adult criminal proceedings in numerous ways. See <u>In re Gault</u>, 387 U.S. 1, 14 (1967) ("From the inception of the juvenile court system, wide differences have been tolerated—indeed insisted upon—between the procedural rights accorded to adults and those of juveniles. In practically all jurisdictions, there are rights granted to adults which are withheld from juveniles."). Appellant, however, does not advance any of those differences as a reason for finding the temporary ban on his possessing firearms unconstitutional. Accordingly, we do not address those differences here.

at the time of the ratification of the Fourteenth Amendment in 1868.[10]  The advent of the juvenile

justice system was largely a twentieth-century phenomenon.

> The first separate and distinct juvenile court in the world was established in Cook County (Chicago) in 1899 through passage of the Illinois Juvenile Court Act.  This Act created a separate court for minors who committed criminal offenses and directed the establishment of separate institutions for youths in order to segregate them from adults, thus avoiding the mixing of juveniles with adult criminals.  The initiation of the juvenile justice system in Virginia occurred in 1904 with the creation of authority for judges to sentence juveniles to indeterminate sentences in separate, privately run facilities, even though they were still tried in the regular criminal justice system.  In 1914, Virginia established juvenile justice jurisdiction for courts by legislation that largely paralleled the Illinois statute.

Juvenile Law and Practice in Virginia, ¶ 1.1 (Robert E. Shepherd, Jr., ed., 1994 & Supp. 1999).

In both 1791 and 1868, Virginia adhered to the common law rule, meaning that

> [a]n infant, under seven years of age, is conclusively presumed to be incapable of crime, and no evidence can be received to rebut the presumption.  Between seven and fourteen, he is within the age of discretion, but still presumed *doli incapax*.  This, however, is a mere *prima facie* presumption which may be rebutted by evidence of capacity sufficient to understand the nature of the act and its consequences.  The presumption of incapacity is very strong at seven years of age, but it decreases with the progress of years.  The first point of inquiry is whether the accused was able to distinguish between right and wrong, to understand the nature of the crime he was committing, and that it was deserving severe punishment.

---

[10] At oral argument, appellant argued that we should view his claim in the historical context of the Second Amendment right as understood at the time of ratification, stating that he did not "know when else you would decide it."

- 16 -

Law v. Commonwealth, 75 Va. 885, 888-89 (1881). At fifteen years of age, there was no presumption of incapacity and a defendant was treated as an adult.[11] Appellant was seventeen at the time of the adjudications and over fifteen at the time of the offenses. Applying the rule in effect at the time of ratification of either the Second Amendment or the Fourteenth Amendment, appellant would have been charged, tried, and punished as an adult.[12] Accordingly, viewing the Second Amendment right as a historical matter, a ban on possession by a juvenile who was adjudicated delinquent for a felonious act rests on the same footing as the presumptively constitutional ban on a felon possessing firearms.[13]

---

[11] If the government rebutted the presumption, children between seven and fourteen were charged, tried, and punished as adults. For example, the Virginia Supreme Court noted an English case where "a boy between eight and nine years of age . . . was executed for arson – it appearing he was actuated by malice and revenge, and had perpetrated the offence with craft and cunning." Law, 75 Va. at 889.

[12] That possession with intent to distribute imitation cocaine was not an offense in 1791 or 1868 does not change the analysis. It is clear that the framers and ratifiers of the Second and Fourteenth Amendments were familiar with the concept of felonies and the power of legislative bodies, such as the General Assembly, to criminalize conduct. To limit the requisite felonies to only those in place in 1791 is the interpretive equivalent of limiting the right to keep and bear arms only to muskets because more modern firearms came to be at a later point in time. We reject such a position. See Heller, 554 U.S. at 582 ("Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way. Just as the First Amendment protects modern forms of communications and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.").

[13] We note that, despite this historical backdrop, the General Assembly did not ban appellant from ever again possessing firearms as a result of his juvenile adjudications. Rather, the ban on his possession of firearms as a result of his juvenile adjudications was only temporary. By the express terms of the statute, his ability to possess firearms would have been restored when he reached the age of twenty-nine. Code § 18.2-308.2(A)(iii). Ironically, appellant's subsequent conviction for grand larceny subjects him to the permanent ban on possession of firearms found in Code § 18.2-308(A)(i), a provision appellant concedes is constitutional.

III. Appellant's Notice Challenge to the Mandatory Minimum Sentence Provisions

In his third assignment of error, appellant attempts to constitutionalize the statutory interpretation argument that underpins his first assignment of error. Specifically, he argues that, because the plain statutory text of Code § 18.2-308.2's mandatory minimum sentence provisions does not mention delinquency adjudications, a person in his situation is not provided notice that he is subject to a mandatory minimum sentence. He argues that our decision in Carter, where we applied the mandatory minimum sentence provisions to a situation where the predicate offense was a delinquency adjudication, is so divorced from the statutory text that it renders the statute void for vagueness.

Central to this argument is appellant's position that a person is deemed to be on notice of statutory prohibitions, but is not on notice of published court decisions interpreting those statutes. Appellant, however, offered no direct authority for this position and provided no authority from which such a conclusion reasonably could be analogized.

> Rule 5A:20(e) provide[s] . . . that the opening brief shall include [t]he principles of law, the argument, and the authorities relating to each question presented. Statements unsupported by argument, authority, or citations to the record do not merit appellate consideration. The [Virginia] Supreme Court concluded that when a party's failure to strictly adhere to the requirements of Rule 5A:20(e) is significant, the Court of Appeals may . . . treat a question presented as waived.

Atkins v. Commonwealth, 57 Va. App. 2, 20, 698 S.E.2d 249, 258 (2010) (internal quotation marks and citations omitted) (alterations in original).

When a party believes that a trial court has erred, it is that party's duty to present that error to this Court with legal authority to support its contention. Fadness v. Fadness, 52 Va. App. 833, 851, 667 S.E.2d 857, 866 (2008). Because appellant provides no supporting legal

- 18 -

argument or authority to support his position, and because we find that this omission is significant, we conclude that this argument is waived pursuant to Rule 5A:20(e).

## CONCLUSION

For the foregoing reasons, we affirm the rulings of the trial court.

Affirmed.